# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO



FILED
JAMES BONINI
CLERK

10 MAY 20 PM 5: 06

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

HARVEST INSTITUTE FREEDMAN :
FEDERATION, LLC :
c/o 514 S. High St. :
Columbus, Ohio 43215 :
  :
  :       Judge _____
  and :
  :       MAGISTRATE JUDGE ABEL
LEATRICE TANNER-BROWN :
11923 Cedar Avenue :       Case No. 2 : 10 cv 449
Hawthorne, CA 90250 :
  :
INDIVIDUALLY AND AS :
REPRESENTATIVES OF A PUTATIVE :
PLAINTIFFS CLASS :
  :
            Plaintiffs, :
  :
     vs. :
  :
THE UNITED STATES OF AMERICA :       JURY DEMAND
c/o The Honorable Eric H. Holder, Jr. :       ENDORSED HEREON
Attorney General of the United States :
U.S. Justice Department :
950 Pennsylvania Ave., N.W. :
Washington, D.C. 20530-0001 :
  :
  and :
  :
c/o Carter M. Stewart :
United States Attorney for the :
Southern District of Ohio :
303 Marconi Boulevard, Suite 200 :
Columbus, Ohio 43215 :
  :
  and :
  :
The Honorable Nancy Pelosi :
Speaker, United States House of :
Representatives :
235 Cannon House Office Building :
Washington, D.C. 20515 :
  :
  and :

The Honorable Ken Salazar        :
Secretary of the Department of Interior of  :
the United States                  :
1849 C. Street, N.W.             :
Washington, D.C. 20240         :
                                      :
            Defendants.      :

## COMPLAINT FOR IMMEDIATE TEMPORARY INJUNCTIVE AND DECLARATORY RELIEF

### A.      PRELIMINARY STATEMENT

1.  This action seeks a declaration of unconstitutionality and an injunction against enactment of impending federal legislation which is racially biased and threatens to cause immediate, grave and irreparable harm to Plaintiffs and members of their putative class. HR 4213, the American Workers, State and Business Relief Act of 2010, passed by the United States Senate on May 18, 2010, and presently pending a vote in the United States House of Representatives, should be enjoined for the reason, a provision within H.R. 4213 that expands the jurisdiction of the United States District Court for the District of Columbia and appropriates $3.4 Billion dollars to fund a settlement in Civil Action 96-1285, Elouise Pepion Cobell, et al. v. Ken Salazar, is racially discriminatory and perpetuates past unlawful racial discrimination. HR 4213, is violative of the Fourteenth Amendment to the United States Constitution as well as the provisions of treaties, which conferred equal civic status upon Freedmen[1] slaves of the Five Civilized tribes, as upon tribal members. These treaties were entered into between the United States and "Five Civilized Indian Tribes" at the close of the Civil War in 1866. An example of the treaties is at Exhibit B. A copy of the discriminatory portion of the HR 4213 known as

---

[1] See, Exhibit A for definitions of Freedmen from various Administrations.

2

the "Individual Indian Money Account Litigation Settlement." is attached at Exhibit C. A copy of the <u>Cobell</u> settlement agreement is at Exhibit D.

2. HR 4213 is unconstitutional by reason of its blatant racially disparate treatment of the descendants of persons who rebelled against the United States during the Civil War and the descendants of persons held in bondage by the aforementioned rebels.

3. During the Civil War, the Five Civilized Tribes, the Seminole, Cherokee, Choctaw, Creek and Chickasaw, entered into treaties with the Confederacy, severing their relations with the United States. As a result of these acts of disloyalty the Five Civilized Tribes forfeited all tribal lands and their status as government wards. In 1866, the United States made treaties with each of the Five Civilized Tribes, setting the terms on which the tribes would continue to exist within the United States, regain their land and trust beneficiary status. All of the treaties with the Five Civilized Tribes eradicated slavery within the tribes and provided that the emancipated "Freedmen" would have certain rights within the tribes. Although these Treaties had a common purpose, the provisions of the various Treaties were not identical. However, under the treaties the Freedmen were emancipated and given civic status equal to Indians whether the Freedmen were adopted into the Tribes or not. The following is a summary of the provisions of the treaties pertinent to this action.

4. **<u>The Seminole Treaty</u>:** The United States entered into its first antebellum treaty with the Seminole in 1866. 14 Stat. 755. The treaty provided that the Freedmen members would have rights equal to those of Seminoles by blood:

> And inasmuch as there are among the Seminoles many persons of African descent and blood, who have no interest or property in the soil, and no recognized civil rights, it is stipulated that hereafter these persons and their descendants, and such other of the same race as shall be

> permitted by said nation to settle there, <u>shall have and enjoy all the rights</u> <u>of native citizens, and the laws of said nation shall be equally binding</u> <u>upon all persons of whatever race or color who may be adopted as</u> <u>citizens or members of said tribe.</u>

14 Stat. 755, 756. In 1898, the Seminole entered into an agreement with the United States to allot its land held in common to individual members. 30 Stat. 567. The agreement made no distinction between the Freedmen members and the members by blood.

5. **The Creek Treaty:** The United States' treaty with the Creek is similar to its treaty with the Seminole. It provided that the Creek Freedmen would have all the rights of members by blood, including the right to share equally in land and funds:

> [A]nd inasmuch as there are among the Creeks many persons of African descent, who have no interest in the soil, it is stipulated that hereafter those persons lawfully residing in said Creek country under their laws and usages…<u>shall have and enjoy all the rights and privileges of native</u> <u>citizens, including an equal interest in the soil and national funds, and</u> <u>the laws of said nation shall be equally binding upon and give equal</u> <u>protection to all such persons,</u> and all others, of whatever race or color, who may be adopted as citizens or members of said tribe.

14 Stat. 785, 786. In 1897, the United States and the Creek Nation agreed to terms on which the Creek Nation's common lands would be allotted. 30 Stat. 496, 514. The agreement made no distinction between Creeks by blood and the Freedmen. In 1901, the Creek entered a second agreement with the United States. 31 Stat. 861. Like the first, this agreement made no distinction between Creek Indian and Freedmen members.

6. **The Cherokee Agreement:** The United States entered into a treaty with the Cherokee in 1866. The treaty of 1866, *inter alia* is a basis for Appellants' claims here. A treaty with the Cherokee Tribe and the United States was concluded on July 19, 1866. Article IV of that Treaty provided that "…[a]ll of the Cherokee freed Negros who were

4

formerly slaves to any Cherokee, and all free Negros not having been slaves, who resided in the Cherokee nation prior to June 1, 1861…shall have the right to settle in and occupy the Canadian district…and will include a quantity of land equal to 160 acres for each person who may so elect to reside in the territory…" Thus, as in the case of the Choctaw and Chickasaw Freedmen, the Cherokee Freedmen were "adopted into the tribe [and] [c]onsequently, they and their descendants were entitled to participate in the allotment of lands equally with members of the tribe by blood." Ross v. Ickes, 130 F.2d 415 (D.C.C. 1942). It is in the failure of the Cherokee to allot land to the Freedmen represented by Harvest in this action that gave rise to the Harvest Complaint.

7. **The Choctaw and Chickasaw Treaty:** The United States entered into a treaty with the Choctaw and Chickasaw Tribes on April 28, 1866. 14 Stat. 769. This treaty provided that the tribes had a choice about how to deal with their Freedmen. If the tribes made their Freedmen members within two years, the tribes would receive a portion of a trust fund, and the Freedmen would receive 40-acre allotments once the Choctaw, Chickasaw and Kansas Indians had made their selections. If the tribes did not adopt their Freedmen and the Freedmen voluntarily removed themselves to other land within Indian Territory, the tribes would get nothing and the [Freedmen would receive a portion of the trust fund. *Id*] The Choctaw and Chickasaw resisted adopting the Freedmen, so the Freedmen were not entitled to the 40-acre allotments. In 1883, the Choctaw adopted the Freedmen into the tribe and declared each was entitled to 40 acres. The tribe made no allotments at that time either. Choctaw Nation of Indians v. United States, 318 U.S. 423, 425 (1943). The Chickasaw never did adopt their Freedmen into the tribe.

8. In 1897, the United States entered into an agreement with the Choctaw and Chickasaw whereby their lands held in common would be allotted. 30 Stat. 496, 505-506. This agreement provided that the Choctaw Freedmen would receive 40-acre allotments. 30 Stat. 506. Before any allotments were made, the United States entered into another agreement with the tribes. This second agreement also provided that Choctaw and Chickasaw Freedmen would receive 40 acres. 32 Stat. 641.

9. Discussed in greater depth below is a detailed discussion of the failure of the United States to properly discharge its trust responsibility to the Freedmen held in bondage or residing in Indian Country at the end of the Civil War. In contrast, through the Cobell settlement the United States is rectifying its breach of fiduciary duty owed to the descendants of the rebellious Five Civilized Tribe slave masters, but denying its breach of fiduciary duty to the slaves of those rebellious tribes. This is blatant and unlawful racial discrimination. The slaves did not rebel against the United States, and were all of African descent. Whereas the rebel Tribes were Native American, rebelled, but now are receiving compensation for the same breaches of fiduciary duty owed to the Freedmen that the United States refuses to acknowledge.

10. The Cobell settlement reaffirms the existence of a trust relationship between the United States and Native Americans dating back to 1887, the time of enactment of the General Allotment Act of 1887, known as the "Dawes Act." The bulk of trust assets alleged within the Cobell action to have been mismanaged by the United States are proceeds of various transactions in land allotted to individual Indians under the Dawes Act. See, Cobell v. Salazar, July 24, 2009, Opinion of the United States Court of Appeals for the District of Columbia, Case No. 08-5500, p. 2.

11. Under 1866 treaties between the United States and the Five Civilized Tribes, Freedmen were accorded equal civic status in relation to the United States as members of the Five Civilized Tribes, whether the Freedman were adopted into the tribes or not.

12. Since Cobell establishes that trust obligations are owed and have been owed by the United States to Indians since the close of the Civil War, Freedman having equal civic status under the 1866 treaties to members of the Five Civilized tribes are also owed fiduciary duties by the United States.

13. The Cobell settlement is evidence that the United States has never repudiated its fiduciary duty as trustee to Native American beneficiaries, i.e. the Cobell Plaintiffs.

14. Contrary to the rulings of the United States Court of Federal Claims in Harvest Institute Freedman Federation, et al. v. United States, Case No. 06-907L and its affirmance by the United States Court of Appeals for the Federal Circuit, the six year statute of limitations applicable to claims against the United States under the Tucker Act 28 U.S.C. § 2501, does not, under the repudiation rule[2], begin to run in relation to claims by the Harvest Institute Plaintiffs, et al. until the United States as trustee repudiates its

---

[2] There is a general "repudiation rule" with regards to equitable trusts that says the statute of limitations will not begin to run on claims to enforce a trust against a trustee until repudiation of the trust relationship. The underlying rationale is that the trustee's possession of the trust assets is presumed to be possession for the beneficiary (i.e. the cestui que trust), and the time should begin to run on claims against the trustee only when the trustee has taken some acts or communicated in a way that is inconsistent with that presumption, so as to provide notice that the trustee has disavowed the trust relationship or is no longer acting in the interests of the beneficiary. The repudiation rule is applicable in the Harvest action for the reason the Freedmen are seeking recovery of trust property itself, and the Government as evidenced by Cobell has not already repudiated its trust relationship with the Freedmen.

The repudiation rule has appeared in cases involving Native American trust claims. For example, in Tunica-Biloxi Tribe v. United States, 1991 U.S. App. LEXIS 10716 (Fed. Cir. may 17, 1991).

Under the law of trust, a cause of action for breach of a fiduciary obligation owed by a trustee does not accrue until the trust is repudiated or terminated. Manchester Band of Pomo Indians, Inc. v. United States, 363 F. Supp. 1238, 1249 (N.D. Cal 1973) (citing United States v. Taylor, 104 U.S. 216 (1881)

trust responsibility to the Five Civilized Tribes, an event which <u>Cobell</u> establishes has never occurred.

15. In light of the above it is inequitable and will result in the perpetuation of racial discrimination against the Freedman Plaintiffs in the Harvest Institute action (hereinafter "Harvest Plaintiffs) to settle claims accruing to the benefit of members of the Five Civilized Tribes, descendants of slaveholders and persons who were disloyal to the United States while failing to resolve claims against the United States by the Harvest Institute Freedmen's Federation's putative class.

16. Plaintiffs such as Leatrice Tanner-Brown are descendants of a person held in bondage by the Cherokee tribe.  Ms. Brown's grandfather, George Curls, the son of a Cherokee held slave, was born in 1897.  He was allotted land by the Cherokee nation at age thirteen.  He was illiterate.  He was despite the promises of the 1866 treaties, denied any assistance by the United States as trustee.  As a result, despite federally imposed restrictions against alienation of his allotment  his land was in violation of these trust restrictions, swindled from him at age twenty-two.

17. Copies of the Tanner documents are at Exhibit E.  Exhibit E demonstrates that Mr. Curls was listed on the Dawes Rolls and received land from the Cherokee tribe.  Ms. Tanner's grandfather despite having received an allotment did not, due to breaches of the fiduciary duties he was owed by the United States receive an Individual Indian Money account or receive any distributions of royalties that went to other Cherokee tribe members as required by the 1866 Treaties and subsequent Acts of Congress. It is these breaches that are the focus of the <u>Harvest</u> lawsuits and the basis for opposing redress only of breaches against Native Americans.

18. It is unlawful racial discrimination for the United States to now decide that it will acknowledge and redress its breach of trust responsibility to the Native Americans, but deny it as to the Freedmen.

19. The trial court in <u>Cobell</u> has stated:

   a. It is clear now that this Court has broad equitable authority to deal with a century or more of trustee nonfeasance and to fashion appropriate remedies, see, <u>Cobell v. Norton</u>, 240 F.3d 1081, 1108-10 (D.C. Cir. 2001) (<u>Cobell VI</u>), but it is also clear that the authority is constrained by traditional doctrinal limits on federal courts that apply in suites against the government, including sovereign immunity and separation of powers.

   b. Accordingly, methods that might be unacceptable in a typical trust case, such as statistical sampling, are available here, where I am instructed to strike a more forgiving "balance between exactitude and cost."

   c. In these unchartered waters, where the trust is of enormous scope, the trustee of unusual character, and the data affected with such great uncertainty, the law of trusts is a sort of magnetic compass; it cannot be expected to point to due north, or to "map directly" onto this context. <u>Id</u>. at 1078.

   d. One useful is not very precise pointer provided by case law is that a trustee may not hide behind obscurity that he himself has created. <u>See, e.g.</u>, <u>Rainbolt v. Johnson</u>, 669 F.2d 767, 769 (D.C. Cir. 1981)

   e. "As to a trustee who fails to keep proper records of his trust it is usually stated that, 'all presumptions are against him' on his accounting, or that 'all doubts on the accounting are resolved against him.'"

   f. The rules that identify and govern a breach of the accounting duty for a simple, 25-year trust with a single beneficiary cannot be applied, unaltered, to a 121-year old perpetual trust, managed by civil servants, with rapidly multiplying beneficiaries and a variety of ever-changing assets. Equity seeks "to do justice to <u>all</u> parties, <u>Bollinger & Boyd Barge Serv., Inc. v. The Motor Vessel, Captain Claude Bass</u>, 576 F.2d 595, 598 (5th Cir. 1978) (Emphasis added.)

   g. --"its orders are adapted to the exigencies of the case," <u>Taylor v. Sterrett</u>, 499 F.2d 367, 368 (5th Cir. 1974), and it seeks to make accurate evaluations of difficult evidence, not to provide "windfalls"

for victims or punishment for wrongdoers. See, Bollinger v. Boyd, 576 F.2d at 598.

h. The trustee's irremediable breach of its accounting duty has unquestionably harmed individual plaintiffs (if not necessarily the plaintiff class): their putative damages claims have been prejudiced by the impossibility of assembling accurate data about the disposition of their assets.

These are but a few of the affirmative statements made by the Cobell Court concerning duties to the Cobell Plaintiffs, including those Cobell Plaintiffs descended from persons disloyal to the United States who forfeited all of their land by reason of their treason. This same expansive philosophy however is not being accorded by the United States to the Freedmen. Accordingly, Plaintiffs are through this action seeking to restrain Congress from enacting litigation that will violate the Constitution by continuing racial discrimination against the Freedmen. See, Exhibit F, transcript of Cobell proceedings, April 8, 2010.

### B.    JURISDICTION AND VENUE

20. This court has jurisdiction over this action under the provisions of 28 U.S.C. §1331 and 28 U.S.C. §2201.

21. The Fourteenth Amendment prohibits unlawful racial discrimination. HR 4213 creates unlawful racial classifications and is not , and can not be, narrowly tailored to advance a compelling governmental interest. HR 4213 is an outrageous and blatantly racially discriminatory law which the Constitution forbids Congress to enact.

22. In addition to 28 U.S.C. §1331 this action is brought directly under the Fourteenth Amendment.

23. Venue is properly laid in the Southern District of Ohio under 28 U.S. §1391(e) for the reason Defendants are officers of agencies of the United States. Plaintiff Harvest

Institute Freedmen Federation, LLC is an Ohio limited liability company with its principal place of business in Columbus, Ohio. Accordingly, under 28 U.S.C. §1391(c) venue is proper in the S.D. Ohio.

## C.      PARTIES

24. Plaintiff Leatrice Tanner-Brown is the granddaughter of George Curls, a person listed on the Final Rolls of Cherokee Freedmen compiled under the Curtis Act of 1898. These rolls were closed in 1907. George Curls is the son of Riley Curls, a person held in bondage by the Cherokee Tribe.

As a descendant of a recipient of an allotment of Cherokee land, Ms. Brown and her relatives should have inherited an Indian Money Account established for her grandfather. In addition under federal law, the land allotted to her grandfather was inalienable for a minimum period of twenty five years or until approved by the Secretary of Interior. The Curls land was alienated by trickery prior to the expiration of the trust period. The United States, as trustee, did not discharge its fiduciary duties to Mr. Curls, a person of no formal educational training, and no individual Indian Money account was ever established for Mr. Curls, and his land was unlawfully transferred.

25. Plaintiff Harvest Institute Freedman Federation is an unincorporated association formed for the specific purpose of seeking redress through the courts to compel the United States to perform obligations owed under various treaties described above to Freedmen. The Institute has conducted research, provided financing and required legal resources, including counsel, to advocate on behalf of Freedmen. The Institute's membership is comprised of persons with African and Native American ancestry, each of whom has standing to sue their own right. The interests which the Institute seeks to

protect are germane to its purpose and do not require the participation of individual Freedmen.

26. Defendant Salazar is the United States Secretary of the Interior. The Department of the Interior is the federal agency with oversight of the Bureau of Indian Affairs and has the statutory duty to enforce, administer and assure compliance by the United States with the terms and obligations of Indian treaties.

27. Defendant Pelosi is the Speaker of the U.S. House of Representatives and responsible for determining which Acts will be brought up for votes in the House of Representatives.

### D.  FIRST CLAIM FOR RELIEF – DECLARATORY JUDGMENT

28. Plaintiffs reallege that which has been stated in paragraphs 1 through 27 above as though fully stated herein.

29. During the conflict between the United States and the Confederate States the so-called "civil war," certain Native American tribes who held persons of African ancestry in bondage, abrogated their allegiance to the United States and supported the Confederacy. Among others, the Creek Nation, Cherokee, Seminoles, Choctaw and Chickasaw Nations, all repudiated allegiance to the United States and supported the rebelling states.

30. The action of these Native American groups violated the terms of then existing treaties with the United States thereby causing these treaties to become voidable.

31. Following the cessation of the conflict between the States, the disloyal Native American tribes by reason of their sovereign status undertook to maintain involuntary

servitude within their respective territorial domains, within the continental United States, notwithstanding the Thirteenth Amendment's abolition of involuntary servitude.

32. In order to reconcile the relationship between these disloyal tribes and the United States, a series of agreements were entered into between the United States and the affected tribes. It is these treaties that are the focus of this action and which Plaintiffs seek to enforce.

33. Under these agreements or treaties slavery was abolished in Indian Country. Moreover, land was transferred to the United States or was agreed to be set aside by the Indian tribes for the benefit of former Indian Country slaves, known as Freedmen or Black Indians, being liberated by the agreements.

34. Despite the undertakings to terminate slavery in Indian Country and to provide various benefits to the liberated persons of African ancestry in accordance with the various treaties discussed, the treaties provided for conveyances of land to qualifying Freedmen. By reason of failure to perform their fiduciary duty owed to the Freedmen, the United States did not cause the expressly agreed upon land conveyances to occur or did not assure that land that was transferred was retained for the required statutory periods or that Freedmen received Individual Money Accounts as required by federal law.

35. This action is being brought on behalf of the descendants of these Freedmen, all persons of African and Native American ancestry, to vindicate their rights to enjoin defendants from enacting legislation that will rectify breaches of fiduciary duty to native Americans, but not Freedmen.

36. In accordance with the provisions of 28 U.S.C. §2201, Plaintiffs seek a declaration that the IIMA Act of 2009 is unconstitutional.

### E. SECOND CLAIM FOR RELIEF - INJUNCTION

37. Plaintiffs reassert that which has been stated in Paragraphs 1 through 36 above as though fully stated herein.

38. Plaintiffs are beneficiaries of the treaties described above.

39. Defendants are officers of the United States who propose to approve legislation that will redress breaches of fiduciary duty to Native Americans, but not to Freedmen.

40. The proposed acts of defendants will cause immediate grave and irreparable harm to Plaintiffs and their class.

41. Plaintiffs do not have an adequate remedy of law and have met with the defendants or their agents but have been unable to reach an agreement. Plaintiffs have exhausted all administrative remedies.

42. Plaintiffs seek damages in an amount equal to the value of the land and related benefits denied to Plaintiffs by defendants failure to perform their fiduciary duties

**WHEREFORE**, Plaintiffs respectfully request that the court enter judgment as follows:

a. Issuing a temporary restraining order, a preliminary and permanent injunction restraining Defendants, and all their officers, agents, servants, employees and attorneys from violating the U.S. Constitution by enacting HR 4213;

b. Issue a Temporary Restraining Order restraining defendants from approving the Cobell settlement;

14

c. Declare and determine that the proposed actions of defendants in opposing <u>Cobell</u> are unconstitutional, illegal and null and void;

d. Award reasonable costs and attorney fees in this matter; and

e. Order any other such relief as the Court considers equitable, proper and just under the circumstances.

Respectfully submitted,

Percy Squire, Esq. (0022010)
Percy Squire Co., LLC
514 S. High Street
Columbus, OH 43215
614-224-6528 Telephone
614-224-6529 Facsimile
psquire@sp-lawfirm.com
Attorney for Plaintiffs

## JURY DEMAND

Now come Plaintiffs and request the within cause be tried to the maximum number of jurors allowable by law.

Percy Squire, Esq. (0022010)

15